**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0693n.06

**No. 15-1863**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 22, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SARAH ANN ZELLER and SCOTT DOUGLAS ZELLER , | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| CANADIAN NATIONAL RAILWAY COMPANY, a Canadian corporation; GRAND TRUNK WESTERN RAILROAD COMPANY, d/b/a CN, a Michigan corporation; ILLINOIS CENTRAL RAILROAD COMPANY, d/b/a CN, an Illinois corporation; CN CUSTOMS BROKERAGE SERVICES (USA), INC., a Delaware corporation; and STELLAR DISTRIBUTION SERVICES, INC., d/b/a CN Supply Chain Solutions, an Illinois corporation, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellees. | ) | |

Before: ROGERS and WHITE, Circuit Judges; HOOD, District Judge.[*]

**HOOD, District Judge.** Plaintiff-Appellant Sarah Ann Zeller ("Zeller" or "Plaintiff")

appeals the decision of the district court granting Defendants-Appellants' Motions for Summary

Judgment and dismissing, among other things, her claims against Stellar Distribution Services,

Inc., Grand Trunk Western Railroad Company, Illinois Central Railroad Company, and Canadian

National Railway Company for relief under Title VII, concluding that Plaintiff had failed to

---

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

exhaust her administrative remedies for claims as to these Defendants. She further appeals the district court's decision to dismiss her Title VII claim against CN Customs Brokerage Services after holding that the entity was not a covered employer and that the claim failed on the merits. Zeller also appeals the district court's decision to dismiss her claim against Canadian National Railway Company under the Federal Employers Liability Act, concluding that there was no evidence of a master-servant relationship between that defendant and her direct employer that would support liability and, furthermore, that the FELA claim failed on the merits. For the reasons stated below, we **AFFIRM**.

## I.

Plaintiff Sarah Zeller began working as a junior customs analyst for Defendant CN Customs Brokerage Services (USA), Inc. ("CNCB"), based in Port Huron, Michigan, in March 2011. CNCB generally assisted customers with the processing of U.S. Customs entries and facilitated filings, customs clearance, and payments. CNCB was a wholly-owned subsidiary of IC Financial Services Corporation, which was, in turn, a wholly-owned subsidiary of Illinois Central Corporation, which was, in turn, owned by Grand Trunk Corporation. Grand Trunk Corporation was a wholly-owned subsidiary of Defendant Canadian National Railway Company ("CNR"). CNCB performs its services for CNR as well as for hundreds of other customers.

Plaintiff's office was located in a trailer, where CNCB was based and which CNCB shared with Defendant Stellar Distribution Services ("Stellar") in the Port Huron railyard owned by Defendant Grand Trunk Western Railroad Company ("GTW"), which was a wholly-owned subsidiary of Grand Trunk Corporation. Pete Bistis, an employee of Illinois Central Railroad Company ("ICRC"), was superintendent of the yard. Because the trailer had no restroom, Zeller and other employees of CNCB and Stellar walked to and used a restroom in another building in

2

the railyard, which housed a yard office owned by GTW.[1] As is evidenced by the office space, CNCB was a small operation. Zeller was CNCB's third employee and reported to Roger Wilson, CNCB's on-site manager and licensed customs broker. CNCB and Stellar employees had no authority to and did not direct the work of employees of one another, nor did CNCB employees receive daily work direction or supervision from Stellar management, CNR, GTW, or ICRC, or vice versa.[2]

During Zeller's employment, CNCB maintained an anti-harassment and anti-retaliation policy and complaint procedure. The policy provided that sexual harassment and retaliation were prohibited, and it outlined a complaint procedure that was available to employees who had concerns about workplace conduct that was contrary to CNCB's clearly articulated expectations. CNCB made clear that allegations of harassment should be reported immediately, and Zeller received and understood the harassment policy and complaint procedure.

Around May 1, 2012, Zeller alleges that she was pushed against a wall near the restroom and fondled by a male employee. She recounts that, when she began to cry, the man covered her mouth and said "shut up bitch." Plaintiff did not report the assault out of fear, embarrassment, and intimidation. Then, in June 2012, she found a note that read "I want to fuck you" along with

---

[1] There are many connections between Plaintiff and the Defendants in this action beyond sharing a trailer and restroom facilities. For example, because CNCB was a small company, Stellar's predecessor and, then, Stellar processed payroll and benefits for CNCB pursuant to a written services agreement during Zeller's employment with CNCB. In this limited administrative role, Stellar was responsible for issuing Zeller's paychecks but never employed her nor controlled Zeller's work assignments or employment. Stellar did not control or otherwise influence CNCB's employees' pay or benefits or any terms or conditions of their employment, nor did Stellar fund CNCB's payroll or benefits. Rather, CNCB was responsible for funding its own payroll and benefits. Meanwhile, Stellar was a warehousing business and had its own role in the railyard, loading and unloading customers' containers for inspection by U.S. Customs and storing cargo while it was transferred from one mode of transport to another. Although Plaintiff has suggested that Stellar did business as "CN Supply Chain Solutions," the evidence of record shows that CN Worldwide North America (Canada), Inc., or CN Worldwide North America (USA), Inc., has the right to use that trade name and that, while Stellar "VP Asst" Dan Bingeman's business card identifies Stellar as providing "Supply Chain Solutions," there is no reference to "CN Supply Chain Solutions."

[2] ICRC is a wholly-owned subsidiary of Illinois Central Corporation.

a used condom on her car in the GTW rail yard. She did not keep the note, but she eventually told her supervisor, Roger Wilson, that she was experiencing harassment at work. Wilson did not report her complaint to anyone in Human Resources. Nonetheless, Zeller has testified that she did not tell anyone about any "harassment" until September 2012. She also reported to the EEOC that another note containing a sexually charged and explicit message was left on her car in July 2012: "you have great tits, I can't wait to suck them," but, again, Zeller did not report this note during her term of employment.

Then on September 1, 2012, which was the Saturday of the Labor Day holiday weekend, Plaintiff became upset at work after going to the restroom and finding that the lock on the women's restroom was not working properly. A conversation took place among Zeller and several Stellar personnel, including Jeffrey Caplinger, regarding the broken bathroom door handle in the GTW yard office. In that conversation, Zeller told Caplinger and others that in May of 2012, an unidentified man told her he wanted to have sex with her in the restroom as she was leaving the trailer where it was located. Zeller was not a Stellar employee, and so Caplinger informed Wilson of Zeller's concerns when Wilson returned to work on Tuesday, September 4, 2012, following the holiday weekend. Wilson discussed Zeller's concerns with her when she next appeared for work on Thursday, September 6, and Zeller told Wilson that a man told her he wanted to have sex with her in the bathroom. Zeller also stated that she did not want to report the issue if she could not be anonymous, but Wilson promptly alerted his manager, CNCB Vice President of Operations Alice Peres da Silva.

Prior to the time of Zeller's complaints, CNCB had contracted for human resources services through a General Sales and Administrative Services Agreement, but, at the time of Zeller's complaint, there was a temporary vacancy in the position that normally provided human

4

resources services to CNCB. Therefore, Peres da Silva informed Susan Ward, a human resources contact at CNR with whom she was familiar, of Zeller's concern. Ward coordinated with the human resources department of ICRC, and a human resources representative was promptly assigned to investigate Zeller's concerns on behalf of CNCB.[3]

ICRC Human Resources Associate Veronica Loewy reached out to Zeller on Monday, September 10, and they spoke about Zeller's concerns the following day. Zeller told her that she did not see the face of the man who had threatened her in May and that he had said, "I want to fuck you in the bathroom." Loewy interviewed eight individuals identified by Zeller who might have information; however, none had witnessed the incident in May 2012, and none could identify the man who might have made the comment to Zeller outside the restroom. On September 21, 2012, Loewy called Zeller and said she had been unable to identify the harasser through investigation. Zeller again confirmed she did not know who made the comment to her outside the restroom, and she did not provide any further detail to support any allegations; she did indicate she thought a camera should be placed by the bathroom. Apparently, there had been some tension in the women's earlier conversations because Zeller also apologized to Loewy for the way she had previously spoken to her, indicating she had been upset. Loewy said there was no need, and to call if Zeller experienced any further issues. On October 1, Loewy sent a letter to Zeller confirming the conclusion of the investigation.

---

[3]Peres da Silva learned that, when Plaintiff went to the bathroom, "somebody cornered her." After speaking with Wilson about the matter, Peres da Silva contacted Susan Ward, a Senior Manager of CNR's Human Resource Department in Montreal, Canada. She wrote to Ward:

> Need you [*sic*] assistance. Roger Wilson reports to me and he is the Manager for the US Brokerage. He was approached confidentially as he is one of the management staff on hand and advised about female employees being sexually harassed and obscene statements to female employees. . . . The individual that has been harassing the female employees are CN Rail employees.
>
> Which HR Individual would Roger work with to get this addresse[d]. . . .

CNCB made arrangements to ensure Zeller was not scheduled to work alone at any time, including on weekends, after October 14, 2012. Nonetheless, when Peres da Silva visited the Port Huron facility in October, Zeller disclosed that, during the first or second weekend of October, she had found a note on her car that read: "I still want to fuck you." Zeller said she did not preserve the note and that she did not even inform Wilson, who she knew would have assisted her. Peres da Silva provided Zeller with a specific protocol to ensure the evidence was preserved to hopefully facilitate further investigation—including not touching it and putting it in a bag for retention.

On Wednesday, October 24, 2012, Peres da Silva again checked in with Zeller to ensure she was not experiencing additional problems. Unfortunately, Zeller's troubles continued. Later that day, in Wilson's office, Zeller observed another note on her car. Wilson informed Peres da Silva of the note that afternoon, and she placed it in a plastic bag. The note, reading "why do you ignore me you are such a bitch but I still want to fuck you your boss does to [sic] but me first," was turned over to human resources. The human resources team notified GTW police and requested investigative assistance. Zeller and Wilson met with GTW police Special Agent George Tolliver on October 25, and Zeller met again with Tolliver and another GTW police agent on October 26. During that interview, she reported hearing comments on unidentified dates such as "[n]ice ass," "[w]anna have a threesome with me and my wife," and other inappropriate comments by unidentified individuals in the GTW Yard office. She claimed that, when she found the first note on the first or second Saturday of October 2012, she also observed a condom on the ground in the parking lot near a wheel of her car, although she did not tell Peres da Silva about that on October 24, and that when she arrived for work on October 24, 2012, personal pictures and office supplies were missing from her desk. During the discussion with Tolliver, Wilson

6

indicated that he had observed a condom at the corner of the building, which Tolliver secured as evidence. At some point in October, Zeller had already placed a camera in Wilson's office to surveil her car while parked at work.

Following her discussions with GTW police, Zeller spoke again to Loewy on October 26, 2012, to discuss these new allegations. Zeller confirmed the information she had previously reported for the first time in September 2012, confirmed that she did not report anything to Wilson in September except for the May 2012 incident at the restroom, and confirmed she had "no idea" who left the notes. Zeller shared that comments she attributed to unidentified individuals in the GTW yard were overheard between May 2012 and after September 1, 2012, and added additional detail to this allegation that she had not shared with the GTW police, claiming someone in the GTW yard office had said within her hearing, "I'd like to hit that."

On November 8, Loewy received a letter from Zeller's attorney. The attorney informed Loewy for the first time that, during the incident near the bathroom, the unidentified man had "blocked [Zeller's] path" but Zeller still "was able to escape." The attorney requested parking lot cameras, a keypad on the women's restroom, security "in the restroom locker room area," and "paid leave time as well as pay for therapy" for Zeller. By that time, (1) CNCB and Stellar employees accompanied Zeller to the restroom, at her request; (2) CNCB made scheduling changes so Zeller did not work alone after mid-October; and (3) CNCB allowed Zeller to place a video surveillance camera in the workplace in an effort to identify the individual involved with the reported notes. Also, by November 8, 2012, upgraded locks for the facility were purchased (and installed shortly thereafter), and, by November 9, security cameras were in the process of being obtained. Meanwhile, the video surveillance camera was still in place, at no time did Zeller

7

work alone, and she did not request a leave of absence; in fact, she repeated that she loved her job.

Then, on November 17, 2012, another CNCB employee, Jennifer Sexton, discovered a note reading "cameras shes mine" in a trailer window screen. Zeller contacted Wilson, the St. Clair County Sheriff, GTW police, and her husband, and met with the GTW police. GTW police identified 16 train crew members or employees who reported to GTW's yard during the relevant period, but after conducting interviews, they could not identify a suspect. The following day, Zeller began an extended leave of absence. Zeller ultimately resigned her employment with CNCB by letter dated August 22, 2013.

Meanwhile, on February 25, 2013, Plaintiff had completed an Intake Questionnaire and filed a Charge of Discrimination against "CN Railroad" with the EEOC accompanied by counsel. Her Intake Questionnaire, submitted with her Charge, stated that she believed that she was discriminated against by her employer, "CN Railroad/Stellar Distribution Services," located at 3373 Griswold Road, Port Huron, Michigan, and identified Wilson as her immediate supervisor and Evans and Caplinger as witnesses. Defendant CNCB (CN Customs Brokerage Services (USA), Inc.) responded to the Charge, by counsel, identifying itself as Zeller's employer and "improperly named as 'CN Railroad.'" Notably, CNR uses "CN" as a trade name but does not use the name "CN Railroad," and no such company exists. Neither CNR nor "CN" was named in the Charge, nor does CNR have an office or agent for service at the address indicated in the Charge and, perhaps most importantly, was never served with the Charge. The EEOC sent the Charge to Connie Valkan as "Legal Counsel to CN Railroad." Valkan was an attorney with Defendant ICRC's Law Department, which oversees "all of [CNR's] U.S. railroad subsidiary companies," and advised human resources with respect to the Zeller matter during the

8

investigation of Plaintiff's complaints. Michael Novak, General Counsel in the ICRC Law Department, reports to CNR's Vice-President of Law.

Zeller and her husband filed a Complaint against CNCB, "Canadian National Railroad," "Canadian National Railroad Police Force," "Grand Trunk Western Railroad, Inc.," "Stellar Distribution Services," and "[a]n unknown individual John Doe," on August 30, 2013, in the United States District Court for the Eastern District of Michigan, alleging sexual harassment under both the Michigan Elliott-Larsen Civil Rights Act ("MELCRA") and Title VII; retaliation under both MELCRA and Title VII; a purported state common-law claim for "failure to provide safe work environment"; negligence under the Federal Employers Liability Act (FELA); claims for alleged violations of 42 U.S.C. § 1983; intentional infliction of emotional distress; sexual harassment under the Michigan Whistleblowers Protection Act; and loss of consortium on behalf of Scott Zeller. The Zellers filed an Amended Complaint against CNCB, CNR, GTW, ICRC, and Stellar, omitting the MELCRA, Section 1983, retaliation, and many state common-law claims and retaining only claims for hostile work environment and sexual harassment under Title VII, negligence under FELA, common-law negligence, and loss of consortium.

Defendants moved for summary judgment, and CNR, a Canadian corporation, also moved to dismiss for lack of personal jurisdiction. In their response to the motion for summary judgment, Zeller and her husband abandoned and waived any FELA, common-law negligence or loss of consortium claim they may have had against CNCB, GTW, and ICRC, leaving only the Title VII claim and the FELA claim against CNR and the Title VII claim as to Defendants CNCB, Stellar, GTW, and ICRC.

On June 30, 2015, the District Court issued a decision, denying CNR's motion to dismiss and declining to exercise jurisdiction over the remaining state-law claims after concluding that

Plaintiff had failed to exhaust her administrative remedies for claims under Title VII as to Defendants Stellar, GTW, ICRC, and CNR. The district court further concluded that Defendant CNCB had fewer than 15 employees and was not a covered entity under Title VII and, in any event, "[a]lthough reasonable minds may differ regarding the severity and pervasiveness of Plaintiff's claims of sexual harassment in this case, there can be no question that CNCB took prompt and appropriate remedial action to correct the situation." Finally, the district court rejected Plaintiff's FELA claim against CNR, finding that there was no evidence of a master-servant relationship between CNR and CNCB to support Plaintiff's theory that she was an employee of CNR. This appeal follows.

## II.

We review the district court's grant of summary judgment de novo. *Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" as to an essential element of the non-movant's case. *Farhat v. Jopke*, 370 F.3d 580, 587–88 (6th Cir. 2003). Where there are no disputed material facts, we determine de novo whether the district court properly applied the substantive law, limiting our analysis to the record as it stood before the district court. *Id.*; *see also Jones v. City of Allen Park*, 167 F. App'x 398, 403 (6th Cir. 2006).

## III.

"Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee based on sex, 42 U.S.C. § 2000e-2, or because she has opposed unlawful discrimination, *Id.* § 2000e-3(a). Title VII requires that a discrimination charge be timely filed with the EEOC. *Id.* § 2000e-5(e)(1) . . . . [B]efore bringing suit under Title VII, a

claimant must exhaust her administrative remedies." *Crowder v. Railcrew Xpress,* 557 F. App'x 487, 491 (6th Cir. 2014). "Exhaustion of administrative requirements is a precondition to filing a Title VII suit." *Lockett v. Potter,* 259 F. App'x 784, 786 (6th Cir. 2008) (citing *McFarland v. Henderson,* 307 F.3d 402, 406 (6th Cir. 2002)); *see Nelson v. General Elec. Co.,* 2 F. App'x 425, 428 (6th Cir. 2001) ("A person who claims to have been discriminated against in violation of Title VII may not seek relief in federal court unless administrative remedies have first been exhausted." (quoting *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992)). The district court properly determined that Plaintiff Zeller failed to exhaust her claims with respect to Stellar, and we affirm that decision.[4]

Zeller failed to name Stellar in the EEOC Charge from which her cause of action depends. As a practical matter, an administrative charge must be filed with the EEOC before a discrimination plaintiff can bring a Title VII action in federal district court, and a party must be named in the EEOC charge before that party may be sued under Title VII "unless there is a clear identity of interest between [the unnamed party] and a party named in the EEOC charge. . . ." *Romain v. Kurek*, 836 F.2d 241, 245 (6th Cir. 1987) (quoting *Jones v. Truck Drivers Local Union No. 299,* 748 F.2d 1083, 1086 (6th Cir. 1984)); *see also Greenwood v. Ross*, 778 F.2d 448, 451 (8th Cir. 1985) (observing that a suit is not barred "where there is sufficient identity of interest between the respondent and the defendant to satisfy the intention of Title VII that the defendant have notice of the charge and the EEOC have an opportunity to attempt conciliation"). In order to determine whether there exists a sufficient identity of interest between parties, courts examine the relationship between the named and unnamed parties at the time the charge is filed

---

[4] On appeal, Zeller does not challenge the district court's conclusion that she failed to exhaust administrative remedies with respect to GTW and ICRC. She has, therefore, abandoned these arguments.

and conciliation efforts occur to determine (1) whether a complainant could have ascertained the role of the unnamed party through reasonable effort at the time of the filing of the EEOC complaint, (2) whether the interests of a named party are so similar to the unnamed party's interests that, for the purpose of obtaining voluntary conciliation and compliance, it would be unnecessary to include the unnamed party in the EEOC proceedings, (3) whether the unnamed party's absence resulted in actual prejudice to the interests of the unnamed party, and (4) whether the unnamed party has, in some way, represented to the complainant that its relationship with the complainant is to be through the named party. *Romain*, 836 F.2d at 245–46. Plaintiff has presented no arguments or facts to suggest that she could not have ascertained the role of Stellar to support any of the remaining contentions.

The fact that Stellar is named as Zeller's employer along with "CN Railroad" on the Intake Questionnaire is insufficient to establish that it was a party to the EEOC action, particularly as the Charge names only CN Railroad. The Supreme Court has recognized that, in appropriate circumstances, ancillary documents may be considered a charge where they "reasonably can be construed to request agency action and appropriate relief on the employee's behalf" in the absence of a formal EEOC charge. *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 404 (2008) (holding that intake questionnaire, accompanied by affidavit containing information required by EEOC regulations, was properly considered "charge" in absence of formal EEOC charge when it could "be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee"). However, in this case, there is a separate, formal Charge against "CN Railroad," and Stellar is not identified on the Charge itself. We are not persuaded that the intake questionnaire can substitute for the Charge itself on these facts. *See*, *e.g., Cairns v. UBS*

12

*Fin. Servs., Inc.*, No. CIV.A. 08-CV-00938L, 2008 WL 4852429, at \*3–4 (D. Colo. Nov. 7, 2008) (holding that EEOC intake questionnaire and related summary did not constitute a charge of discrimination against a defendant for purposes of administrative exhaustion where Charge of Discrimination did not name defendant because intake questionnaire claimed but did not set forth an allegation of discrimination under ADEA against defendant). Much like the defendant in *Cairns*, Stellar is named as a party against which Plaintiff seeks relief in the Intake Questionnaire, but Stellar employees are identified in that document only as witnesses with information about the allegations of a hostile work environment. There is no suggestion that they are responsible for the environment as proponents of a hostile environment or as agents of Plaintiff's employer, CNCB. To an objective observer, it would be clear that Plaintiff did not seek relief against Stellar and that Stellar was not named in the Charge for this reason.

On the facts before us, CNCB did not have a sufficient identity of interest with Stellar such that the Charge exhausted Plaintiff Zeller's administrative obligations under Title VII with respect to the company. We affirm the district court's decision to dismiss Zeller's Title VII claim as to Stellar for failure to exhaust her administrative remedies as Zeller cannot establish as a matter of law that Stellar was provided notice of her claim by the Charge.

## IV.

Next, we affirm the district court's decision that Zeller's Title VII claims fail against CNCB and CNR as a matter of law. To be directly liable for non-supervisor harassment under Title VII, an employer must have known, or should have known, "of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 (6th Cir. 1994)). An employer is only liable when "its response manifests

indifference or unreasonableness in light of the facts'" at hand. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008) (quoting *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 873 (6th Cir. 1997)). Regardless of whether CNCB and CNR are covered "employers" under Title VII, and regardless of whether Zeller was subject to sufficiently severe and pervasive harassment, Zeller's Title VII claims fail on the merits, because there is no genuine issue of material fact as to whether the entities reasonably responded to Zeller's complaints.

Although Zeller's harassment began in May of 2012 and continued in June and July, neither CNCB nor CNR had sufficient knowledge to trigger their responsibility to take remedial steps until September 2012, when Zeller discussed her concerns with Caplinger. Thereafter, the entities' conduct was far from indifferent or unreasonable, as they promptly investigated Zeller's case. As soon as he could, Caplinger informed Wilson of Zeller's concerns, and Wilson promptly sent the information up his chain-of-command. By the next week, Human Resources began an investigation. Although that investigation was inconclusive, CNCB-CNR employee Peres da Silva continued to check in on Zeller throughout October and helped Zeller preserve the harassing notes from her car. Furthermore, by the end of October, the companies involved the GTW police.

The companies also took physical steps to help ensure Zeller's safety. After Zeller reported the May incident to Caplinger in September, a Stellar or CNCB employee accompanied her to the women's restroom on each occasion. CNCB rearranged Zeller's work schedule so she would never work alone after October 14, 2012. Wilson also allowed Zeller to install a security camera in his office to surveil Zeller's car while it was parked at work. Furthermore, new locks were purchased on November 8 and new key pads to the women's restroom area were installed in late November. Cameras were also installed in the Port Huron yard area in January 2013.

The scant evidence in the record indicating that Zeller told Wilson about the harassment in June 2012 does not make the CNCB's response unreasonable. The only evidence that Zeller informed Wilson before September of 2012 consists of several lines in Loewy's deposition, where Loewy read from notes of a conversation with Wilson in the fall of 2012. The notes read:

> The incident occurred early summer, June 2012. . . . Employee asked to remain confidential. Wilson asked complainant what was wrong. Complainant said she did not want to talk about it. . . . She wanted to keep it confidential. Did not want Wilson reporting, but made Wilson aware of why she was upset. . . . Complainant said during one of her trips to the rest room someone made an inappropriate section [sic] comment to her. Complainant did not tell Wilson the name of the employee or what the sexual comment was. Wilson did ask complainant, but she did not tell him the specifics. . . . Complainant did not want to file a formal complaint. . . . Wilson did not report this to anyone. He . . . [h]onored her request to keep it confidential.

This evidence, taken in the light most favorable to Zeller, shows at most that she informed Wilson that an inappropriate sexual comment had been directed at her. This complaint, alone, was not enough to trigger CNCB's duty to take remedial steps. Thus, the fact that CNCB did not investigate or implement remedial measures until after Zeller's September 2012 disclosure does not make the company's response unreasonable. To the contrary, CNCB and CNR acted promptly and reasonably and therefore cannot be liable under Title VII.

## V.

Finally, we affirm the district court's decision that Zeller's FELA claims against CNR fail as a matter of law. [5] FELA applies only to employees of railroads engaged as common carriers by rail in interstate commerce. 45 U.S.C. § 51 (providing that "[e]very common carrier

---

[5] In her Statement of Parties and Issues, Appellant indicated she intended to appeal the dismissal of her FELA claim against CNCB. However, her brief presents arguments concerning the claim against CNR alone. As Zeller has abandoned these arguments, we address them no further.

by railroad while engaging in commerce . . . shall be liable in damages to any person suffering injury while [s]he is employed by such carrier in such commerce"). Zeller was not directly employed by CNR, a railroad arguably subject to the provisions of FELA, nor has Zeller provided any evidence of a master-servant relationship sufficient to raise a question of fact concerning her relationship to CNR for the purposes of FELA. *See Kelley v. S. Pac. Co.*, 419 U.S. 318, 324 (1974) (holding that, under common law, plaintiff can establish employment with rail carrier for purposes of FELA where nominally employed by another entity when (1) serving as "borrowed servant of the railroad," (2) "acting for two masters simultaneously," or (3) deemed "subservant of a company that was in turn a servant of the railroad"); *see also Baker v. Tex. & Pac. Ry. Co.*, 359 U.S. 227, 229 (1959) (holding that, where there is some evidence of master-servant relationship, it is "an issue for determination by the jury" as to whether defendant railroad is plaintiff's employer under FELA).

Notably, Zeller has identified no one other than CNCB personnel who supervised or controlled her activities as a customs analyst. *See Campbell v. BNSF Ry. Co.*, 600 F.3d 667 (6th Cir. 2010) (holding that supervision and control by railroad is entitled to great weight in considering whether railroad may be deemed plaintiff's employer); *Kelley*, 419 U.S. at 325–26 (teaching that, to establish control for purposes of "borrowed servant" or "dual servant" theories, plaintiff must show that railroad had significant supervisory role—control or right to control—over the means and manner of her job performance); *see also Baker*, 359 U.S. 227, 228–29 (finding adequate supervision and control to impose liability on railroad where plaintiff was employee of different entity but was performing track maintenance task under direct supervision of railroad's track supervisor at time of injury); *Cimorelli v. N.Y. Cent. R.R. Co.*, 148 F.2d 575 (6th Cir. 1945) (finding adequate supervision and control to impose liability where plaintiff's

employer and railroad had contract under which railroad retained control over conduct of plaintiff's employer's operations at location at bar). We can discern from the facts that Plaintiff was employed by CNCB, which is an indirectly-owned subsidiary of CNR that, at times, acts as CNR's agent for brokerage services at arm's length but which maintains its own supervisors, employees, and work rules. There is no evidence that Ward was serving in a capacity through which she supervised or controlled employees of CNCB when, as an employee of CNR, she assisted Peres da Silva in finding someone to investigate Zeller's claims of harassment *on behalf of CNCB*. Such agency relationships between a plaintiff's employer and a railroad, alone, are not enough to create an employment relationship. *See Kelley*, 419 U.S. at 323, 325 ("finding of agency is not tantamount to a finding of a master-servant relationship"). CNR did not pay Zeller, nor is there evidence that CNR was in a position to discipline or discharge Zeller. While Peres da Silva, a CNR employee in one capacity, also oversees the daily operations of CNCB in her role with CNCB, there is no reason to assume that she acts in her capacity with CNR or otherwise on behalf of CNR when she regularly travels to Port Huron, "manages the customs brokerage," and directly supervises Roger Wilson or when she signed the letter extending to Zeller her offer of employment. The undisputed material facts support the conclusion that CNCB is "distinct in organization and responsibility" from CNR. *Id*. at 327. In the absence of evidence from which a fact finder might conclude that CNR and Plaintiff are in a master-servant relationship for the purposes of FELA, we affirm the decision of the district court.

17

**HELENE N. WHITE, Circuit Judge** (dissenting). Because summary judgment was improperly granted on both the Title VII and FELA claims, I respectfully dissent. Fact issues remained whether Defendants CNCB and CNR reasonably responded to Zeller's sexual harassment complaints. As for the FELA claim, Zeller presented evidence that CNR had a significant supervisory role over the means and manner of her job performance, and summary judgment was thus improper.

## I.

Zeller testified and presented documentary evidence that she was assaulted in May 2012, and subjected to sexually charged threats and intimidation by train-crew employees at the GTW rail yard from around May to mid-November 2012. Zeller informed her supervisor, CNCB's Roger Wilson, in June 2012 that she was experiencing harassment at work. It is undisputed that Wilson did not report her complaint to anyone, in Human Resources or otherwise. Notably, CNR's harassment policy does not require supervisors to report incidents of sexual harassment and thus is not an "effective" policy. *See Clark v. UPS, Inc.*, 400 F.3d 341, 350–51 (6th Cir. 2005) (observing that an effective anti-harassment policy "should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy.") (citations omitted).

On September 1, 2012, Zeller and several Stellar employees, including supervisor Jeffrey Caplinger, spoke about the broken door handle in the women's bathroom in the GTW yard office, about which Zeller was upset. Zeller told Caplinger and others that in May of 2012, a railyard employee told her he wanted to have sex with her in the restroom. Caplinger informed

18

Wilson of this when Wilson returned to work on Tuesday, September 4, 2012. Wilson discussed Zeller's concerns with her on Thursday, September 6, and Zeller told Wilson that a man told her he wanted to have sex with her in the bathroom. Wilson alerted Peres da Silva, CNCB's Vice President of Operations and CNR's Senior Manager of Customs Brokerage Services, who wrote CNR's Senior HR Manager Susan Ward in Montreal of Zeller's problems:

> Need you [*sic*] assistance. Roger Wilson reports to me and he is the Manager for the US Brokerage. He was approached confidentially as he is one of the management staff on hand and advised about female employees being sexually harassed and obscene statements to female employees. [] The individual that has been harassing the female employees are CN Rail employees. Which HR Individual would Roger work with to get this addresse[d][.]

PID 6031–32, 6074.

CNR's Ward coordinated with the HR department of Defendant ICRC and ICRC HR Associate Veronica Loewy spoke to Zeller on September 11. Zeller told Loewy that she did not see the face of the man who threatened her in May, but described him as a 5'10" white male and described his clothing in detail. Zeller told Loewy that he had said, "I want to fuck you in the bathroom." Loewy interviewed eight individuals by phone; none could identify the man. On September 21, 2012, Loewy called Zeller and said she was unable to identify the harasser through investigation. Zeller said that she thought a camera should be placed by the bathroom. PID 2306. Loewy said to call her if Zeller experienced any further issues. On October 1, Loewy sent a letter to Zeller, on CN letterhead, confirming the investigation was closed. PID 2203, 2307. Zeller testified that she was extremely upset when she received this letter.

A reasonable jury could conclude that Loewy's "investigation" was woefully inadequate; she merely spoke to eight persons *by phone* and closed the investigation on October 1, 2012. Similarly, a reasonable jury could conclude that the "remedial measures" taken were too little too

late. It was not until October 14, 2012, that CNCB made arrangements to ensure Zeller was not scheduled to work alone at any time, including on weekends. PID 2379–414. And it was Zeller herself who in late October brought a video camera to work to surveil the area where she parked her car at work. PID 2208. It was not until November 2012 that upgraded locks for the facility were *purchased*.

Under these circumstances, the adequacy and promptness of Loewy's investigation and CNBC's and CNR's remedial measures were for a jury to determine.

## II. FELA

Although not formally employed by rail carrier CNR, Zeller may establish a master-servant relationship sufficient to establish employment for purposes of FELA under the borrowed-servant and dual-servant theories. *Kelley v. S. Pac. Co.*, 419 U.S. 318, 324 (1974). Where there is some evidence of a master-servant relationship, it is for a jury to determine whether a defendant railroad is a plaintiff's employer under FELA. *Baker v. Texas & Pac. Ry. Co.*, 359 U.S. 227, 229 (1959). Supervision and control by the railroad is entitled to great weight in considering whether the railroad may be deemed a plaintiff's employer. *Campbell v. BNSF Ry. Co.*, 600 F.3d 667 (6th Cir. 2010).

To establish control for purposes of the "borrowed servant" or "dual servant" theories, Zeller must show that CNR had a significant supervisory role over the means and manner of her job performance – control or right to control. *Kelley*, 419 U.S. at 325–26; *see also Baker*, 359 U.S. 227, 228–29 (plaintiff was performing track maintenance task under direct supervision of railroad's track supervisor); *Cimorelli v. New York Central R. Co.*, 148 F.2d 575 (6th Cir. 1945) (plaintiff's employer and railroad had contract under which railroad retained control over conduct of plaintiff's employer's operations at location at issue).

Zeller presented sufficient evidence of CNR's control or right to control her job performance to survive summary judgment. CNR admitted that "Senior Manager, Alice Peres da Silva, *a CNR employee*, oversees" CNCB's daily operations. PID 6333-34/CNR Answers to Plaintiff's First Set of Interrogatories. That DaSilva oversaw CNCB employees is also evidenced by her email to CNR's Senior Human Resources Manager Susan Ward regarding Zeller's complaints, which stated that CNCB's Roger Wilson, Zeller's direct supervisor, "reports" to da Silva, and da Silva's testimony that she visited the Port Huron office regularly *to manage and oversee CNCB's operation*. In addition, CNR's Da Silva hired Zeller, extending an offer of employment to Zeller in a letter on CNCB letterhead, PID 2310-11, and Da Silva responded to Zeller's complaints of harassment by reporting them to CNR's Senior H.R. Manager Susan Ward, who coordinated the investigation. Ward testified that CNR had the responsibility to assure that Zeller had a safe workplace. PID 6491-92. Da Silva instructed Zeller after conferring with CNR's Human Resources department as to specific protocol CNR wanted Zeller to follow should future incidents of harassment occur. PID 6291.

Employees of CNCB (and all CNR's U.S. subsidiaries and indirect subsidiaries) are governed by the "CN Worldwide Associate Handbook,"[1] which addresses workplace policies, access to personnel files, attendance and punctuality, corrective action, promotion and transfers, performance appraisals, leave requirements, and ADA, FMLA, and EEO policies, among other things. PID 2249. All of CNR's U.S. subsidiaries are overseen by ICRC's General Counsel Novak, who testified that there was *one code of business conduct* that applies to the entities that operate as CN in the U.S. and Canada. PID 6709-10. Finally, both Stellar and CNCB admitted using the CN logo. PID 6353, 6373 (responses to interrogatory).

---

[1] CNR supported its motion for summary judgment with this Handbook.

Given this evidence, the district court improperly found that the sole connection between CNR and CNCB is that CNCB asked CNR to assist in finding someone to investigate Zeller's concerns on CNCB's behalf because it temporarily had no human resources personnel. PID 7542. Zeller presented evidence sufficient to create a fact issue regarding whether CNR had a significant supervisory role over the means and manner of Zeller's job performance. *Baker*, 359 U.S. at 229.